PTH:CWE
F. #2021R00379

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNT @elijahdavis21 WHICH IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANTS**<br>Case 21 MJ 657 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, MATTHEW RIZZO, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with Instagram account @elijahdavis21 which is stored at a premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), an electronic communications service and/or remote computing service provider headquartered in Menlo Park, California (the "Subject Account"). The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in their possession, further described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), assigned to Border Enforcement Security Task Force, and I have

been employed by HSI since approximately May 2019. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have received training and participated in investigations regarding, among other things, the trafficking and importation of narcotics and unlawful drug trafficking, and have gained knowledge and expertise in the collection and identification of drug evidence. I have participated in multiple investigations with HSI, and have participated in the execution of search warrants involving electronic evidence of the type requested here.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I believe Elijah Jamir Davis (the "Defendant") violated Title 21, United States Code, Sections 952(a) and 960(a)(1) (importation of controlled substances), Title 21, United States Code, Section 963 (conspiracy to import controlled substances), Title 21, United States Code, Section 841(a)(1) (distribution and possession with intent to distribute controlled substances) and Title 21, United States Code, Section 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Subject Crimes"). There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## PROBABLE CAUSE

5. On or about May 21, 2021, Elijah Jamir Davis Defendant arrived at Terminal 5 of JFK in Queens, New York aboard JetBlue flight B6380 from Jamaica.

6.      As the Defendant passed through Immigration and Customs, CBP officers referred the Defendant for a random law enforcement examination.  The CBP officer conducting the examination observed that the Defendant was in possession of a large black roller suitcase that had been checked in during the flight and small black roller suitcase that had been a carry-on bag.

7.      As a part of the examination, the CBP officer asked the Defendant a series of routine questions regarding his travel to the United States, and specifically about whom he had been traveling with during his most recent trip.  The Defendant said that he traveled with friends and they were returning from their trip to Jamaica.  In response to a question about the location of his friends, the Defendant said that he did not know where his friends were and stated he was not sure if they were still waiting for bags or if they had left the inspection area.

8.      The CBP officer proceeded to inspect the Defendant's luggage.  Upon inspection of the Defendant's large suitcase, the CBP officer noticed that it contained a black Canik brand box.  The CBP officer asked if there was a firearm in the box and the Defendant replied "yes" and stated that he traveled with his personal gun.  The Defendant stated that he informed JetBlue that he was flying with his handgun but did not provide any paperwork confirming this account.

9.      Upon opening the box, the CBP officer found a Canik #TP9sf 9mm firearm with an empty magazine and a smaller box of "Superx" Winchester brand 9mm ammunition.

10.     Next, the CBP officer examined the smaller black roller suitcase.  After emptying the bag of its contents, the CBP officer noticed the bag was still unusually heavy.  In order to figure out the reason for the bag's unusually heavy weight despite the contents being removed, the CBP officer took the bag to an inspection area so it could go through an X-Ray machine.

11. The X-Ray imaging revealed that there was a peculiar square panel on the side of the bag that did not appear to be a standard part of the structure of the bag itself. The CBP officer inspected the side of the bag where the X-Ray revealed the square panel by probing it and found a package wrapped in plastic.

12. While probing the small package, the CBP officer asked the passenger when he purchased the bag and the Defendant said he had bought it roughly a month ago (the Defendant later said to HSI agents that he was given a smaller bag by an unknown individual to take with him on the flight but did not know to whom he was supposed to give the bag). As the CBP officer further examined the bag he found two additional packages and removed them.

13. The CBP officer also noticed that within the large black roller suitcase there was a black laptop bag. As a part of the examination, the CBP officer removed the laptop and laptop bag from the black roller bag and probed the sides of the laptop bag. Upon noticing an abnormal object within the lining of the laptop bag, the CBP officer cut open the sides of it, revealing two additional packages.

14. A total of five vacuum sealed packages containing a white powdery substance were seized from the Defendant's bags. One of the packages was probed and tested with a GEMINI analyzer. The substance tested positive for Cocaine.

15. The Defendant was placed under arrest for the importation of narcotics into the United States. The large roller suitcase was rechecked in a private search room and a small bag of a substance that appeared to be Marijuana was found in one of the side pockets. The substance was tested using a REAGENT test kit and tested positive for the presence of Marijuana.

16.     The Defendant told CBP officers that he planned to stay overnight in New York before traveling to Washington. However, the Defendant claimed that he did not know where he was going to stay and denied having any plans to meet with anyone except his friends with whom he had traveled from Jamaica.

17.     The Defendant was arrested and taken into HSI custody.

**Probable Cause to Believe That There is Evidence of Crimes on the Subject Account**

18.     After HSI agents informed the Defendant of his Miranda rights, he consented to being interviewed and answering questions.

19.     During the HSI agents' interview of the Defendant, he stated that he arranged to go on the trip to Jamaica with two college friends ("Tegan" and "Jeff"). The Defendant explained that he communicated with Tegan on Instagram and recalled making travel arrangements, for the trip to and from Jamaica, through Instagram. The Defendant specifically recalled Tegan inviting him on the trip and Tegan informing him that some of Tegan's friends would also be on the trip.

20.     He further told HSI agents that his Instagram account user identification is @elijahdavis21 but he could not recall what Tegan's or Jeff's user identifications were on Instagram nor either one of their last names.

21.     The Defendant said that when he got to Jamaica, he, Tegan and Jeff met up with another two-to-three individuals, that he did not know personally but they were known to either one of or both Tegan and Jeff (the "Unknown group"). The Defendant told HSI agents that he could not recall the names of the individuals from the Unknown group.

22.     According to the Defendant, prior to his return flight from Jamaica to JFK, one of the individuals from the Unknown group provided him with the small roller travel bag to use for

5

the flight. He understood that the bag had come from someone else, but the Defendant told HSI agents that he could not recall from whom the bag had come.

23. The Defendant told HSI agents that he understood something was likely in the bag when he received it but did not ask any questions at the time. He said to HSI agents that he was never told to provide the bag to anyone upon his arrival at JFK nor was he told to drop the bag at any particular location when he got to New York. However, the Defendant confirmed that he planned to stay in New York for at least one night.

24. Additionally, the Defendant told HSI agents that he flew from Jamaica with Tegan and Jeff, and they both lived in New York, but he could not recall the exact locations of their residences.

25. Based on my training and experience, I know that individuals engaged in criminal conduct often upload photographs, images and written statements reflecting that criminal conduct on social media accounts and use social media accounts, such as Instagram, to communicate with others regarding that conduct. Here, the Defendant told HSI agents that his primary method of communication regarding his Jamaica trip was through Instagram with at least one of his friends, with whom he had traveled.

26. Furthermore, in my experience, individuals who enlist couriers to transport drugs from one location to another, usually have a plan to recover the drugs upon the courier's arrival at the destination location. Accessing the Defendant's account will allow law enforcement to see if there are any communications related to the Criminal Offenses with potential co-conspirators, including the individuals with whom he had traveled.

## BACKGROUND CONCERNING INSTAGRAM[1]

27. Instagram is a service owned by Facebook, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the Target Account listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

28. Facebook collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers. Facebook keeps records of changes made to this information.

29. Facebook also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

---

[1] The information in this section is based on information published by Facebook on its website and its Instagram website, including, but not limited to, the following webpages: "Data Policy," https://help.instagram.com/519522125107875; "Information for Law Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

30. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

31. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Facebook maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Facebook and third-party websites and mobile apps.

32. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

33. Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Facebook to access the contact lists on their devices to identify which contacts are Instagram users. Facebook retains this contact data unless deleted by the user

and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Facebook to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

34. Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

35. One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Facebook's servers.

36. Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@"). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

37. An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Facebook's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

38. Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

39. Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders are not able to view their disappearing messages after they are sent but have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

40. Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

41. Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Facebook retains records of a user's search history and followed hashtags.

42. Facebook collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Facebook to personalize and target advertisements.

43. Facebook uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content. Facebook maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

44. In some cases, Instagram users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45. For each Instagram user, Facebook collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

46. In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to

establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

47. For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, photos and videos are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

48. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Facebook can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, messaging logs, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

49. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

50. Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, the Target Account may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

51. Therefore, Facebook's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram, messages that are evidence of the Subject Offenses, and video and photographic evidence of the Subject Offenses. In my training and experience, such information may constitute evidence, including information that can be used to identify the account's user or users.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using this warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment B. Upon receipt of the information described in Attachment B (Section I), government-authorized persons will review that information to locate the items described in Attachment B (Section II).

## CONCLUSION

53. Based on the foregoing, I request that the Court issue the proposed search warrant.

54. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant

by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

55. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

56. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Matthew Rizzo
Special Agent
Department of Homeland Security, Homeland Security Investigations

Sworn to me through the transmission of this
Affidavit by reliable electronic means, pursuant to
Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
4th of June, 2021

/a Roanne L. Mann
HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

14

# ATTACHMENT A

## Property to Be Searched by Facebook

This warrant applies to information associated with Instagram account @elijahdavis21 that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

I. **Information to be disclosed by Facebook, Inc. ("Facebook") regarding the Instagram account**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Facebook, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each account or identifier listed in Attachment:

A. All business records and subscriber information, in any form kept, pertaining to the Account, including:

1. Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2. All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3. Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4. Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5. All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6. Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, from March 1, 2021 through the present;

7. Privacy and account settings, including change history; and

8. Communications between Facebook and any person regarding the account, including contacts with support services and records of actions taken;

B. All content (whether created, uploaded, or shared by or with the Account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, from March 1, 2021 through the present;

C. All content, records, and other information relating to communications sent from or received by the Account from March 1, 2021 through the present, including but not limited to:

1. The content of all communications sent from or received by the Account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2. All records and other information about direct, group, and disappearing messages sent from or received by the Account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4. All associated logs and metadata;

D. All content, records, and other information relating to all other interactions between the Account and other Instagram users from March 1, 2021 through the present, including but not limited to:

1. Interactions by other Instagram users with the Account or its content, including posts, comments, likes, tags, follows (including unfollows,

approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3. All contacts and related sync information; and

4. All associated logs and metadata;

E. All records of searches performed by the account from March 1, 2021 through the present; and

F. All location information, including location history, login activity, information geotags, and related metadata from March 1, 2021 through the present.

Facebook is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 952(a) and 960(a)(1) (importation of controlled substances), Title 21, United States Code, Section 963 (conspiracy to import controlled substances), Title 21, United States Code, Section 841(a)(1) (distribution and possession with intent to distribute controlled substances) and Title 21, United States Code, Section 846

(conspiracy to distribute and possess with intent to distribute controlled substances) (the "Subject Crimes") that have been committed by Elijah Jamir Davis (the "Defendant") and others, known and unknown, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

    (a) Communications with co-conspirators and accomplices;

    (b) Evidence indicating how and when the accounts were accessed or used, to determine the geographic and chronological context of each account access, use, and events relating to the Subject Crimes under investigation and the account owners;

    (c) Evidence indicating each account owner's state of mind as it relates to the crime under investigation;

    (d) The identity of the person(s) who created or used each account, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to these warrants in order to locate evidence, fruits, and instrumentalities described in these warrants. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.